UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE:<br>RYAN EDWARDS and<br>LESLIE EDWARDS<br><br>DEBTORS | CASE NO. 14-50717 |
| COMMUNITY FINANCIAL SERVICES BANK,<br><br>PLAINTIFF<br><br>VS.<br><br>RYAN EDWARDS and<br>LESLIE EDWARDS<br><br>DEFENDANTS | ADVERSARY PROCEEDING<br>NO.15-5010 |

**MEMORANDUM OPINION**

This matter is before the Court after the conclusion of a trial on the merits of the cause of action under 11 U.S.C. § 523(a)(6) brought by Plaintiff, Community Financial Services Bank ("CFSB"), against the Defendants, Ryan Edwards and Leslie Edwards. In its complaint, CFSB seeks to hold the debt owed to it by the Defendants nondischargeable. Both CFSB and the Defendants appeared at trial and were represented by counsel. At the trial, the parties presented evidence, both written and documentary. Upon consideration of the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

**FINDINGS OF FACT**

In 2004, Mr. Edwards formed Ryan Marine, LLC ("Ryan Marine"), a new and used boat dealership in Murray, Kentucky. In addition to boat sales, Ryan Marine was also in the business of

consignment sales of boats, as well as offering boat maintenance and repair services. Mr. Edwards is very sophisticated, having run his own company for several years, as well as previously working in the marine industry for a number of years. Mr. Edwards is highly educated, with a college degree in Business Management from Murray State University.

Mr. Edwards served as the sole member and manager of Ryan Marine for the entirety of its existence. In 2004, shortly after Mr. Edwards formed Ryan Marine, it obtained a floor plan loan from GE Commercial Distribution Finance Corporation to finance its boat inventory ("GE Loan"). The GE Loan was secured by Ryan Marine's inventory, among other things, and required Ryan Marine to immediately remit the proceeds from the sale of the inventory to GE. Ryan Marine satisfied the GE Loan in 2010.

## I. The CFSB Loan

On August 5, 2009, Mr. Edwards, as sole member and manager of Ryan Marine, obtained a $500,000 loan from CFSB (the "CFSB Loan"). Jason Pittman, the loan officer assigned to the loan made to Ryan Marine, testified he took all of the loan documents to the place of business of Ryan Marine. Both Mr. and Mrs. Edwards met Mr. Pittman at Ryan Marine. One of the documents taken by Mr. Pittman was a Commercial Security Agreement ("Security Agreement") to finance Ryan Marine's boat inventory. Under the Security Agreement, Ryan Marine granted CFSB a security interest in the following property, defined as "Collateral" in the Security Agreement, to secure the CFSB Loan:

> All BOATS, MOTORS, TRAILERS, INVENTORY, ACCOUNTS RECEIVABLE, FURNITURE, FIXTURES & EQUIPMENT OF RYAN MARINE LLC LOCATED AT 3311 STATE ROUTE 94 E. MURRAY KY.

> In addition, the word "Collateral" also includes all of the following,

>whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:
>
>(D) All proceeds (including insurance proceeds) from the sale, destruction. loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process."

The Security Agreement required Ryan Marine to hold the Collateral in trust for CFSB and immediately remit the proceeds of the sale of collateral to CFSB.  Specifically, the Security Agreement provided:

>Transactions Involving Collateral. …Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

The Security Agreement concluded with the following sentence, "[Ryan Marine] has read and understood all of the provisions of this Commercial Security Agreement and Agrees to its terms." Mr. Edwards signed the Security Agreement on behalf of Ryan Marine.  Only Mr. Edwards signed the Security Agreement.  With no ownership interest of Ryan Marine, Mrs. Edwards did not sign the Security Agreement.

To further secure the CFSB Loan, both Mr. Edwards and Mrs. Edwards executed and delivered to CFSB Commercial Guaranties personally and unconditionally guaranteeing payment of the debt by Ryan Marine.

In addition to the Security Agreement and the Guaranties, both Defendants executed a mortgage in favor of CFSB on their personal residence.  This was a second mortgage, with Wells Fargo holding the first mortgage on the property.  Mr. Edwards, on behalf of Ryan Marine, also

executed a mortgage in favor of CFSB on the commercial real estate owned by Ryan Marine.

CFSB also provided to the Defendants a Notice of Final Agreement. This document included an integration clause, providing that it "represents the final agreement between the parties" and that there was "no unwritten oral agreements between the parties." This document then listed the numerous financial documents signed by the Mr. and Mrs. Edwards individually, and by Mr. Edwards on behalf of Ryan Marine. This document is signed by both Defendants.

Mr. Pittman testified he left copies of all of these financial documents with the Defendants, and Mr. Edwards testified that he kept and filed the documents with his other business records. These facts were not disputed.

## II.     Advances under the CFSB Loan

By March of 2010, seven months after the CFSB Loan's inception, Ryan Marine had borrowed the maximum amount available under CFSB's loan. Although Mr. Edwards made some principal payments, the balance never fell below $450,000 after February 2010.

## III.    Ryan Marine began to fail in 2009

Shortly after receiving the CFSB Loan, Ryan Marine began to experience difficulties. In the middle of 2009, Genmar Holding, Inc., the parent company of the manufacturer and seller of Four Winns Boats, one of Ryan Marine's main new boat suppliers, filed for Chapter 11 bankruptcy. The value of the new Four Winns boats in the inventory declined because their warranties were discharged in the Four Winns bankruptcy.

By the end of 2010, Ryan Marine was already $71,550 out of trust with CFSB. The balance of its loans secured by inventory at the end of 2010 was $449,540. The value of the inventory at the end of 2010 was $377,890. Ryan Marine remained out of trust with CFSB from 2010 until it

dissolved.

## IV.     Edwards Lifestyle

Despite their failing company, the Edwards converted CFSB's collateral for their personal use. Between 2009 and 2013, even though Ryan Marine was failing and out of trust with CFSB, Mr. Edwards increased his capital distributions from Ryan Marine. The Defendants also upgraded their personal vehicles, resulting in over $1,950 a month in car payments. Mr. Edwards also purchased an interest in an airplane and purchased a $100,000 motor home.[1] The CFSB Loan proceeds were used to pay down family loans owed to Mr. Edwards' grandmother. Finally, the CFSB Loan Proceeds were used to pay the mortgage on their personal residence.

### A.     Capital Distributions

In 2010, the same year that Ryan Marine's inventory fell from $810,733 to $377,890 and it ended the year $75,000 out of trust with CFSB, Mr. Edwards began taking capital distributions from Ryan Marine in addition to the $48,000 salary Ryan Marine paid Mr. Edwards. Between 2010 and 2012, Mr. Edwards took a total of $118,153 in capital distributions from Ryan Marine, in addition to the $144,000 Mr. Edwards received from Ryan Marine as salary during that time. In 2011, the year Ryan Marine reported a loss of $312,279 and ended $314,260 out of trust with CFSB, Mr. Edwards took a $29,617 capital distribution from Ryan Marine.

### B.     Upgraded Personal Vehicles - paid through Ryan Marine

In October 2010, despite Ryan Marine reporting a $145,000 loss in 2009, Ryan Marine's

---

[1] The exact financial transactions involving the airplane and the motor home are still somewhat confusing to the Court. Mr. Edwards commingled his boat business transactions with that of his consignment business transactions and the financial transactions with his family. Due to the muddled nature of these transactions, the exact source of the payments for the airplane and motor home is unclear.

inventory falling 50% in 2010, Ryan Marine's total assets decreasing 40% during those years, Ryan Marine's sales falling 27% from the previous year, and Ryan Marine being out of trust with CFSB, the Edwards upgraded Mrs. Edwards' 2006 Infiniti QX56 to a brand new 2011 Infiniti QX56, increasing their monthly payment on this vehicle from $863 to $935. Shortly thereafter, in February 2011, Mr. Edwards upgraded his personal vehicle to a 2011 Dodge Ram with monthly payments of $646.73 per month. A few months later, he upgraded to a different 2011 Dodge Ram, which had monthly payments of $1,019.

The Edwards paid the monthly installments for these vehicles directly from Ryan Marine's Checking Account at CFSB. Mrs. Edwards wrote most of the checks for these monthly payments from Ryan Marine's business account. Eventually, at the end of 2012, the Edwards did decide to downgrade these vehicles to more reasonable vehicles.

**C.     Paid for Mortgage on Personal Residence through Ryan Marine**

From 2007 until 2014, the Edwards lived in a house they purchased in 2007 for $329,000. Wells Fargo had a first mortgage on the property. The original principal amount of the Wells Fargo mortgage in 2007 was $296,910. Their mortgage payments to Wells Fargo were approximately $2,500 per month. In 2010, the Edwards began paying their personal mortgage payment out of Ryan Marine's checking account held by CFSB. Leslie Edwards wrote most of these checks.

The Edwards granted CFSB a second mortgage on this residence to secure their personal guarantees of the CFSB Loan. The Edwards lived at this residence until shortly before they filed bankruptcy in 2014. At the time the Edwards filed bankruptcy, they reported the value of the residence as $329,900 and the balance of the Wells Fargo Mortgage as $258,689, a difference of $71,211.

When the Edwards filed bankruptcy, they abandoned this residence and let Wells Fargo foreclose on it. The residence was vacant for two years before being sold to Wells Fargo at a judicial sale for $193,000. CFSB received none of the proceeds from the sale of this property.

### D. Paid down loan from Mr. Edwards' Grandmother

Mr. Edwards admitted that he received a $270,000 unsecured, undocumented loan from his grandmother after he received the CFSB loan to pay towards the GE loan. According to his 2004 examination conducted on February 25, 2015, Mr. Edwards used the proceeds from the sale of inventory to pay down this loan to his grandmother. As of the date of the 2004 examination, he estimated the balance on this loan to be $125,000. Mr. Edwards had used $145,000 of Ryan Marine assets to pay down his personal loan to his grandmother.

As of the date of trial, the indebtedness owed to CFSB totaled $610,053.55. This amount consists of the following: $501,010.23 in principal, $73,597.51 in interest, $9,480.38 in late charges, and $25,965.43 in attorney's fees.

### V. The End

At some point in 2014, Ryan Marine was dissolved. On October 12, 2014, Mr. and Mrs. Edwards filed a voluntary petition for Chapter 7 relief under the Bankruptcy Code. On April 1, 2015, after receiving an extension of time, CFSB timely filed this complaint objecting to the dischargeability of the Defendants' obligation to CFSB.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

CFSB seeks to except the debt owed by the Edwards from discharge under 11 U.S.C. § 523(a)(6). Section 523 provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
> ....
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6).

CFSB bears the burden of proving each of the elements of this section of the Bankruptcy Code by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Kennedy*, 249 F.3d 576 (6th Cir. 2001). Furthermore, exceptions to discharge are strictly construed against creditors. *Rembert v. AT & T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir. 1998).

### I.     Mr. Edwards

The Court will first start with Mr. Edwards. Under 11 U.S.C. § 523(a)(6), a debt is not dischargeable if it is due to a willful and malicious injury. CFSB argues that Mr. Edwards' sale of the boat inventory subject to its security interest and subsequent retention and use of the sales proceeds constitutes a willful and malicious injury. The Supreme Court has explained that for a debt to be non-dischargeable under § 523(a)(6), the "actor [must] intend "the consequences of an act," not simply "the act itself." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)). The Sixth Circuit Court of Appeals has further qualified that a willful and malicious injury occurs only if the debtor (1) desires "to cause the consequences of his act," or (2) "believes those consequences are substantially certain to result from it." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455,

8

464 (6th Cir.1999); *In re Bradley*, 507 B.R. 192 (6th Cir. BAP 2014).

In the context where a debtor has converted a creditor's collateral, it has been held that the 'willful' requirement of 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights. *In re Bradley*, 507 B.R. 192 (6th Cir. BAP 2014).; citing *Takacs v. Ruderson (In re Ruderson)*, 2007 WL 4570581, at 6 (Bankr. N.D. Ohio 2007).

It is at this point that Mr. Edwards main defense comes into play. Mr. Edwards argues and testified that he did not read the loan documents that he signed, including the Security Agreement. Because he did not read the documents, he claims he did not know of CFSB's lien rights as to the Collateral.

The Court rejects this defense for a number of reasons. First, the Court finds Mr. Edwards testimony that he did not read the loan documents not credible. The Court supports this finding by again noting that Mr. Edwards was quite adept at financing his business ventures, having financed his boat business operations for several years prior to the CFSB Loan. Mr. Edwards had filled out several loan applications in the past, including the GE Loan, and was quite familiar with the terminology of the application. Additionally, as pointed out above, Mr. Edwards is a sophisticated business person, with a degree in Business Management. The Court simply cannot believe that Mr. Edwards would sign financial documents without reviewing their terms.

Mr. Pittman testified he brought the financial documents to the Defendants on August 9, 2005. He testified that the Defendants, were given an opportunity to read the documents, that the Defendants reviewed the documents, and that the Defendants affixed their signatures to the documents. The Court finds Mr. Pittman's recollection of these events very credible. Finally, Mr.

Pittman left the documents with the Defendants, which Mr. Edwards acknowledge receiving and filing with their business records.

Additionally, the Court must reject Mr. Edwards ignorance defense because, under the law, he is presumed to know the contents of the contract he signed with CFSB. Unless Mr. Edwards was not given an opportunity to read the documents, could not read the documents due to some language incapacity, or his signature was obtained by fraud, Mr. Edwards is bound by the document's terms. *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012 (6th Cir. 1952); *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000) ( in the absence of fraud or willful deceit, one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions). Here, evidence was presented that Mr. Edwards was both able to read the documents and that he was given an opportunity to read the documents. No evidence was presented of fraud, willful deceit, or that Mr. Edwards was misled as to the terms of the documents.

Mr. Edwards also testified that he believed that the only collateral securing the CFSB Loan was his residence and the commercial property of Ryan Marine. Again, the Court finds this testimony unbelievable for a number of reasons. First, Mr. Edwards, in addition to signing the Security Agreement pledging the boat inventory, also signed a Mortgage pledging his residence as collateral to secure the CFSB Loan. It makes no sense that CFSB would ask him to sign the Security Agreement pledging the residence as collateral and then also ask him to sign a Mortgage also pledging the residence as collateral.

Next, the residence and commercial property had at best slightly under $150,000 in equity at the time of the CFSB Loan. Again, it makes no sense that CFSB would make a $500,000 loan on collateral with equity of under $150,000. This point is supported by the uncontroverted

10

testimony of Ms. Caroline "Betsy" Flynn, the Chief Executive Officer of CFSB. Ms. Flynn testified that CFSB would never make a loan with such a low loan to value ratio as suggested by Mr. Edwards. Simply speaking, the argument and testimony that CFSB would give a $500,000 loan based on property with at most $150,000 in equity is unbelievable and disingenuous.

Taking these points together, this Court has no trouble finding that Mr. Edwards both read the documents he signed, and was aware of CFSB's lien rights. Accordingly, the Court holds that based on the Security Agreement, and other documents, CFSB had a security interest in the proceeds of the sale of collateral and that Mr. Edwards had a duty to use the proceeds of sales of collateral to pay CFSB.

The record firmly establishes that Mr. Edwards knew about CFSB's lien rights and knew that failure to remit the proceeds would be substantially certain to harm CFSB. The parties intended the proceeds of sale of collateral to be used to pay down the debt owed to CFSB and Mr. Edwards did not do so. He retained them for different, personal uses.

Under § 523(a)(6), the business person is held to a higher standard as a business person who is more knowledgeable of the natural consequences of his acts. *In re Bradley*, 507 B.R. 192, 203 (6th Cir. BAP 2014) *citing Trust Co. Bank v. Ricketts (In re Ricketts)*, 16 B.R. 833, 834–35 (Bankr. N.D. Ga. 1982). *See also Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987)(A willful and malicious conversion occurs where an individual in bankruptcy obtains vehicles, as an officer of a dealership, with money advanced by a secured creditor, and then disposes of those vehicles without remitting the sale proceeds to the secured creditor. A debtor's sales out of trust creates a debt that is nondischargeable under § 523(a)(6)).

Mr. Edwards signed the financing documents, and knew about CFSB's lien rights in the

11

collateral.  At trial, Mr. Edwards admitted he sold the collateral without remitting the proceeds to CFSB.  Consequently, the Court finds that the injury to CFSB was willful.

The Court now turns to the malicious element.  The test for maliciousness in the context of § 523(a)(6) does not focus on a debtor's subjective intent to repay, but instead "means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm."  *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986).  The focus is on whether a debtor acted deliberately in knowing disregard of a creditors' rights in property.  *In re Bradley*, 507 B.R. 192, 204 (6th Cir. BAP 2014); *Ocean Equity Grp., Inc. v. Wooten (In re Wooten)*, 423 B.R. 108 (Bankr. E.D. Va. 2010).  Under § 523(a)(6), malice is inferred when a car dealer knows the harm for his failure to remit the proceeds obtained from vehicles sold out of trust.  *Auto. Fin. Corp. v. Leonard (In re Leonard)*, 2012 WL 1565120, at \*11 (Bankr. E.D. Tenn. 2012).

The Court finds Mr. Edwards acted maliciously as defined by § 523(a)(6). The record establishes that Mr. Edwards acted in "knowing disregard" of CFSB's security interest in the proceeds of the collateral.  Mr. Edwards knew that his action of keeping the proceeds of the sales was wrongful under the terms of the documents.  Mr. Edwards knew that his use of the proceeds for other purposes other than repaying CFSB would injure CFSB.  The fact that Mr. Edwards made minimum monthly payments does not excuse the injury to CFSB's security interest.  The record is devoid of any facts which could support the notion that Mr. Edwards' retention of the proceeds was with just cause or excuse.

Mr. Edwards converted the proceeds of the sales of collateral which were subject to CFSB's security interest.  CFSB's damages are a debt that is the result of a willful and malicious injury.  Accordingly, as to Mr. Edwards, the $610,053.55 debt is non-dischargeable pursuant to the

provisions of 11 U.S.C. § 523(a)(6).

## II. Mrs. Edwards

The Court now turns to Mrs. Edwards. Unlike Mr. Edwards, Mrs. Edwards did not sign the Security Agreement. Her signatures were limited to the personal guaranty and the mortgage on the personal residence. CFSB presented no evidence that Mrs. Edwards ever read the Security Agreement, or knew of its specific terms.

CFSB argues that because Mrs. Edwards wrote the checks that dissipated the collateral proceeds, the debt should also be non-dischargeable to her as well. The Court does not agree.

In addition to not signing the Security Agreement, there was no evidence presented that Mrs. Edwards knew the source of the funds being dissipated. As stated above, the finances of Mr. Edwards and Ryan Marine were confusing at best. Factoring in the profits from Mr. Edwards' side consignment business, as well as repair business associated with the boat dealership, it is quite plausible that Mrs. Edwards had no knowledge that the funds being spent were the proceeds from CFSB's collateral.

CFSB, in its trial brief, uses terms such as "knowing conspiracy" and "active participation or advancement to convert" property. No evidence was presented at trial, however, to demonstrate a conspiracy between Mrs. Edwards and Mr. Edwards to convert CFSB's collateral.

While there was clear evidence that Mrs. Edwards was authorized to write checks for Ryan Marine and that she did write checks for Ryan Marine, there was no evidence that she was personally aware of the source of the funds being spent in those checks. As stated above, to find a debt non-dischargeable under § 523(a)(6), a debtor's actions must be willful. Here, the Court simply cannot make a finding that Mrs. Edwards was aware of CFSB's lien rights or that she willfully

13

injured CFSB. Without such a finding, the Court cannot except this debt from Mrs. Edwards' discharge.

## CONCLUSION

This was not a difficult case for the Court. With respect to Mr. Edwards, the evidence was clear that he granted CFSB a security interest in his inventory, that he knew he granted a security interest, and that he deliberately failed to remit the proceeds of the collateral to CFSB. Any argument that Mr. Edwards did not read or understand the import of the loan documents is simply not credible. The Court finds Mr. Edwards willfully and maliciously injured CFSB, and that the debt owed to CFSB should be excepted from Mr. Edwards' discharge.

With respect to Mrs. Edwards, the Court finds that CFSB failed to present sufficient proof that Mrs. Edwards knowingly and willfully converted its collateral. Rather, the evidence presented simply showed that Mrs. Edwards was a signatory on the checking account. No evidence was presented that she knew or should have known the source of the funds in the checking account, or that the funds being dispersed were the proceeds from CFSB's collateral. As such, this debt will not be excepted from Mrs. Edwards' discharge.

A separate Judgment consistent with this Memorandum Opinion will be entered this same date.

Alan C. Stout
United States Bankruptcy Judge

Dated: July 17, 2017

14

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RYAN EDWARDS and | ) | BANKRUPTCY NO. 14-50717 |
| LESLIE EDWARDS | ) | CHAPTER 7 |
|                 DEBTORS | ) | |
| _____ | ) | |
| | ) | |
| COMMUNITY FINANCIAL SERVICES BANK, | ) | |
| | ) | |
|                 PLAINTIFF | ) | |
| | ) | |
| VS. | ) | ADVERSARY PROCEEDING |
| | ) | NO.15-5010 |
| RYAN EDWARDS and | ) | |
| LESLIE EDWARDS | ) | |
|                 DEFENDANTS | ) | |

**JUDGMENT**

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that judgment is rendered in favor of the Defendant, Leslie Edwards, and the debt the subject of this adversary proceeding is not excepted from discharge under 11 U.S.C. § 523(a)(6).

**IT IS FURTHER ORDERED** that judgment in the amount of $610,053.55 is granted in favor of the Plaintiff, Community Financial Services Bank, and against the Defendant, Ryan Edwards, and that such debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

This is a final and appealable order and there is no just reason for delay.

_____
Alan C. Stout
United States Bankruptcy Judge

Dated: July 17, 2017